ETHEL McCRACKEN MATLOCK ET AL v.
TROY McCRACKEN ET AL

5-5713                                   479 S.W. 2d 508

Opinion delivered February 14, 1972
[Rehearing denied March 20, 1972.]

W. S. *Walker* and Robert W. *McCorkindale II*, for appellants.

*Jerry D. Patterson*, for appellees.

J. FRED JONES, Justice. This is an appeal by Ethel Matlock, formerly Ethel McCracken, from a decree of the Boone County Chancery Court in favor of Troy Mc-Cracken in connection with the title to farm lands in Boone County.

When Tom McCracken died intestate in 1940, he left surviving him ten children by a former marriage

and a widow and three children by his second marriage. The appellee, Troy McCracken, is the oldest of the ten children by the first marriage, and the appellant, Ethel Matlock, is the former wife and surviving widow of Troy's brother, Ray McCracken, who died intestate in 1966.

The land involved in this litigation consists of approximately the north half of a 200 acre tract acquired at a commissioner's sale in 1920 by deed of conveyance to Troy. The title was confirmed in Troy by chancery court degree in 1922 and in 1923 the lands were mortgaged to the Federal Land Bank by Troy. By warranty deed dated March 16, 1928, Troy conveyed title in the land to his brother, Ray, and this deed was filed for record on March 6, 1933. Under date of October 14, 1933, Troy executed another warranty deed conveying title in the same land to Ray and this deed was filed for record on December 8, 1936. The legal record title to the property has remained in Ray McCracken, his heirs and assigns, since the aforesaid conveyances. The appellant, Ethel Matlock, married Ray McCracken in 1934. She lived with him until the time of his death in 1966 and they had two children. She subsequently married her present husband, Ray Matlock.

The present litigation was commenced when the appellant, Mrs. Matlock, filed suit in the Boone County Chancery Court alleging that she is the widow of Ray McCracken, deceased; that she has obtained quitclaim deeds from her children to a life estate in the land involved; that for a number of years she has permitted Troy McCracken to occupy and use portions of the lands rent free, and that Troy McCracken is now attempting to lease or rent portions of the land. She prayed a restraining order and injunction against Troy preventing him from entering into any portion of the land and from renting or making any use of it.

Troy McCracken filed an answer and cross complaint in which he admitted the alleged relationship of the parties and admitted his possession of, and attempts to rent, a portion of the land. By way of cross com-

plaint Troy alleged that the lands were acquired by him in 1920 to be held in trust by him for his father, Tom McCracken, who also was the father of Ray McCracken; that Tom McCracken died intestate in 1940 leaving surviving his widow, Letha McCracken, and ten children by a previous marriage, including Troy and Ray McCracken. He alleged that his father, Tom McCracken, took possession of the land in 1920 and lived upon and controlled it until his death in 1940. He alleged that in 1928 at the request of his father he deeded the lands to his brother, Ray, with the understanding that he would be joint owner with Ray in said lands. He alleged that immediately following the death of their father, Tom McCracken; under a specific agreement and understanding with his brother, Ray, he took pedal possession of the north half of the land as set out in a metes and bounds description containing 95.4 acres more or less, and he alleged adverse possession since 1940. He further alleged that at the time of the death of his father a family settlement agreement was entered into between his father's widow and all of his father's heirs, including Ray McCracken, whereby it was agreed that he and his brother, Ray, would share the farm; that they agreed upon the division of the property, and that he took immediate possession of the lands he acquired under said family settlement and agreement. Troy prayed for a dismissal of the complaint and that the title to the lands described in his counterclaim be quieted and confirmed in him.

The chancellor found that Tom McCracken, the father of Troy and Ray, acquired the land in controversy in 1920; that he was the real beneficial owner thereof, and that the naked legal title was held by Troy McCracken, and subsequently by Ray McCracken, in trust for their father, Tom McCracken; that immediately after he caused the legal title to be conveyed to Troy in 1920, Tom McCracken moved onto the lands, lived thereon and exercised dominion and control over same from the date of its acquisition until his death in 1940. The chancellor further found that immediately following the death of Tom McCracken, his surviving widow and heirs entered into a voluntary and valid family settle-

ment agreement as to property rights under which Ray McCracken was to have the south half of the farm and the widow and remaining heirs were to have the north half. The chancellor found that Troy McCracken acquired from the widow and heirs the right to take and hold in his own right, free of all right and claim of the widow and heirs of Tom McCracken, the north portion of the McCracken land as described in the counterclaim. The court further found that Ethel Matlock is the owner of a life estate in the remainder of the lands described in her original complaint and the decree was entered accordingly.

On appeal to this court Mrs. Matlock relies on the following points for reversal:

"The court's findings were contrary to the law and the evidence, and the court erred in denying appellants' motion for a new trial.

The court erred in permitting testimony by defendant, McCracken, and several witnesses, in defendant's behalf over the objections and exceptions of appellants, as to statements made by a dead man in violation of Ark. Constitution schedule, § 2.

The court erred in permitting testimony by defendant, McCracken, and several witnesses in his behalf over the objections and exceptions of appellants, as to a parol agreement involving lands, in violation of the statute of frauds.

The court erred in finding that a resulting trust existed, as defendant did not present 'clear and convincing' evidence of the existence of a resulting trust.

The court erred in failing to apply the doctrine of laches."

On appeals to this court in chancery cases, we do not reverse the chancellor's decree on questions of fact,

unless the finding of the chancellor is against the preponderance of the evidence. *Wiles* v. *Wiles,* 246 Ark. 289, 437 S. W. 2d 792. Under her first point Mrs. Matlock questions the sufficiency of the evidence to sustain the chancellor's finding that Troy went into possession of the premises immediately following the death of Tom McCracken and the family settlement agreement, and that the division line is established by a fence which divides the land claimed by Troy and the land belonging to the heirs at law of Ray McCracken. We are of the opinion that the chancellor's findings on these points are not against the preponderance of the evidence.

The evidence is overwhelming that soon after the death of Tom McCracken in 1940, his widow and heirs, including Ray McCracken, entered into an agreement whereby it was agreed that Ray should have the south half of the farm and that the widow and remaining heirs should have the north half of the farm. There is ample uncontradicted evidence that Troy purchased the interest of the widow and remaining heirs and paid them the agreed consideration for their interest. There is also ample evidence that Ray recognized Troy's acquired interest under the agreement; that he recognized his own interest as limited to the south half of the farm, and further recognized a fence line as the division between the north and south halves.

Troy McCracken testified that he was working in Idaho when he received word that his father had died; that his father's widow and all the heirs attended the funeral and thereafter all attended a meeting wherein they agreed to divide the property with the south half going to Ray and the north half going to all the other heirs. He says that following the funeral and family agreement, he returned to Idaho for a short period of time; that he sent to his brothers and sisters $285 each in payment of their interest in the north half of the property, and that he deeded to the widow a 27 acre tract of land for her own and her childrens' interest in the farm. He testified that he moved onto the land in 1943 or '44; that he was away part of the time working in

defense work but that he has lived on the property almost continuously since 1959. He testified that in 1950 or '55 he built a barn on his part of the property and that he converted a· garage on the property into living quarters and has been living in it ever since 1962 or '63.

Troy's testimony was substantiated by the testimony of a brother, Rex McCracken, and by the testimony of several other brothers and sisters as well as unrelated witnesses.

Mrs. Ruth McCracken Boyd, a sister at whose home the family meeting was held testified that Ray and his wife attended the meeting and that Ray stated his dad had told him he was to have one-half of the place and that their step-mother and the other children were to have the other half where the old home place was. She testified that this arrangement was agreeable to all concerned, and that Troy later purchased all of the other children's interest in the north half of the property. She says that Ray later built a home on the south part of the property.

Walsie Dempsey, a sister of Troy and Ray McCracken, also testified in support of Troy's testimony.

Mary McCracken Harrol, a half sister to Ray and Troy, testified as to the family settlement and purchase by Troy. This witness testified that Troy has been living on the property "a portion of each year since our dad passed away." This witness testified that when her mother sold the place Troy had deeded to her in exchange for their interest in the home place, her mother gave to her and her brothers and sisters $400 each as their interest in the Tom McCracken land.

Olive McCracken Whittier, another sister, corroborated the other testimony as to the family meeting and property settlement agreement.

Jo Hilligass, a sister of Ray and Troy, testified that she was 18 years of age and living at home when her

father, Tom McCracken, died. She corroborated the other testimony as to the family agreement following her father's death. She also testified that Ray and the appellant attended the meeting. She also corroborated the other testimony as to Troy's purchase of the remaining interest of the widow and heirs in the property.

Gladys McCracken Crambrink, another sister, corroborated the testimony as to the family agreement and Troy's subsequent purchase.

James McCracken, a half brother, testified that he was 16 years of age when his father died. He corroborated the other testimony as to the family agreement and the fact that Ray was present. He testified that Ray attended the family meeting and announced how the property was to be divided, with one-half to Rav and the other half to be divided between the remaining children, according to his father's wishes. This witness also testified that when his mother traded her, and her children's, interest in the farm to Troy, Ray advised them in the matter and told them what their interest amounted to.

On recall Troy McCracken testified that he and Ray discussed the division line between their property soon after their father's death; that at that time there was a fence across the property; that a part of the fence had fallen down and had not been rebuilt because Ray's cattle used water from Troy's pond. He says that he had a survey run shortly after his brother's death and that the survey was run along the old fence line agreed upon by him and Ray. He says that the surveyor was directed to follow the old fence line.

Ernest Roe, an uncle of Troy and Ray, testified that Ray told him Troy was to have the north part of the farm and that he, Ray, owned the south part. He says that Ray showed him the division line.

"Q. What did he say?

A. Well he said they had settled and showed me where the lines was, and divided it, and said he was going to make Troy title to it when he sold his cattle."

Bill Hampton testified that he is unrelated to the McCrackens but is familiar with the McCracken land. He says that after Tom McCracken's death, Troy lived on a portion of the property and Ray lived on another portion of it. He says that about two years before Ray's death he discussed with Ray a proposed change in a road through the property, and that Ray told him he, Ray, owned the south half of the property, and that Troy owned the north half. He says that in connection with the proposed road change, Ray pointed out to him where the division line of the property was. Under questioning by the court this witness testified that Ray pointed out a fence running east and west as the property division line. This witness also testified that Ray told him about the family agreement as testified to by the other witnesses.

Jo and Granville Hulsey testified that they are not related to the McCrackens. They both testified that about seven or eight years prior to the date of their testimony, they were doing some work on a house for Ray when Troy came in from Oklahoma where he had been working. They testified that they heard Ray tell Troy that it was necessary for him, Ray, to mortgage Troy's part of the property in order to obtain money to build the house. They testified that Troy told Ray that he should not have mortgaged his (Troy's) part of the property, and that Ray said he would have the mortgage paid off in about four years.

Cecil Gass testified that the involved property originally belonged to his grandfather and that upon inquiry of Ray as to who owned his grandfather's old place, Ray told him that he and Troy owned it but that he would have to make Troy a deed to his part of it.

Ray Hulsey testified that he built the barn for Troy about 1953, and that he was paid by Troy. He says that

Troy paid him in part with lumber which Troy had cut from the farm. He testified that there was a saw mill on the north part of the property for about eight months during the period Troy exchanged lumber for the labor in building the barn. He says the saw mill was on Troy's side of the property.

The testimony of Mrs. Matlock was the only evidence offered by her in contradiction of the evidence offered by Troy. She testified that she did not remember a meeting at Mrs. Boyd's house sometime after Tom McCracken's death. She then testified:

"Q. You don't remember that meeting?

A. There might have been a meeting, but I don't know, other than the family gatherings is all I know about it."

Mrs. Matlock testified that after her father-in-law's death, Troy would be on the land where they lived two or three months out of the year. She testified that Troy would come home during the winter months and would then go somewhere else to work. She says she doesn't remember any farming he did on the property and she testified that her husband Ray, farmed all the property. She testified that the first time Troy started using the property was in 1966 when he started cutting the hay, etc. She testified that she had heard the testimony pertaining to the building of the barn on the north half of the property. She says the barn was built in about 1951, and that her husband Ray furnished the material for the barn. She says she does not know whether Troy did any work on the barn but does remember that he was around there. Mrs. Matlock testified that her husband Ray did everything he could to see that Troy was properly taken care of and provided for; that she never did see Ray give Troy any money but that in about 1960 Ray gave Troy 10 heifers. She then testified as follows:

"Q. Why was it he gave him these heifers?

A. So that he would have an income.

Q. Where did he pasture these heifers?

A. There on the farm.

Q. What part of the farm?

A. On the north part.

Q. Which side of the—was it on one or the other side of the highway?

A. On the east side.

Q. On the east side of the highway?

A. That is right."

Mrs. Matlock testified on cross-examination that Troy lived in the Tom McCracken home after Tom McCracken died and that she does not know how many years he lived there. She testified she knew of no money her husband owed Troy but that he gave Troy the heifers so that Troy could have an income. She testified that Troy pastured the heifers on the north part of the farm and that he kept them until about 1967. She says that Ray helped Troy cut hay on the farm; that she isn't sure when Troy sold the heifers but it was sometime after her husband's death in 1966. Mrs. Matlock testified that there is a fence dividing the property; that her home is located south of the fence and that Troy lives north of the fence. She says that she thinks more of the farm is south of the fence than is north of it. In rebuttal Troy testified that when he was working in Idaho and Oregon in 1942, he sent Ray $1,200 at one time and $750 at another time. He says that he intended for Ray to safely keep the money for him but that Ray had authority to use or invest it. He says that Ray used the money and never did repay him except by giving him the ten heifers.

We find no merit in the appellant's second assignment. We have consistently held that the so-called "Dead

Man's Statute," Arkansas Constitution, Schedule, § 2, applies only to suits by or against executors, administrators or guardians. *Baker* v. *Eibler*, 216 Ark. 213, 224 S. W. 2d 820. We have also held that the prohibition does not apply to witnesses who are not parties to the suit. *Meers* v. *Potter*, 208 Ark. 965, 188 S. W. 2d 500; *McRae* v. *Holcomb*, 46 Ark. 306.

As to appellant's third point, when testimony pertaining to the family property settlement agreement was first objected to, the chancellor reserved his ruling until all the evidence was before him and we are of the opinion the chancellor's finding that there had been sufficient compliance with the terms of the agreement as to remove it from the statute of frauds is not against the preponderance of the evidence. There was considerable testimony that Troy went into possession of the north half of the property soon after his father's death and that Ray thoroughly and continuously recognized his rights therein. Furthermore, if Troy and Ray held the property in trust for their father under their respective deeds, as the chancellor found that they did, then Mrs. Matlock was awarded far more interest in the property as a result of the property settlement agreement, than she would have been entitled to under the law of descent and distribution.

As to the appellant's fourth point, we are of the opinion that there was clear and convincing evidence that both Troy and Ray held the property title in trust for their father, Tom McCracken. Troy McCracken was 71 years of age when he testified in 1970, consequently, he would have been about 21 years of age when the deeds were made to him in 1920. He testified that he was working away from home at that time and that he paid nothing for the land. He says that his father, Tom McCracken, paid the purchase price for the land (recited in the deed as $3,475.00) and had the deed made to him without his knowledge at the time. He says his father and step-mother were having some difficulty, as he remembers it, and his father simply had the legal title placed in him. He says that his father later had the title confirmed in him as prerequisite for a loan his

father obtained on the property. He says that he signed a mortgage at his father's request but received none of the proceeds from the loan. He testified that in 1933 he deeded the land to Ray at his father's request and without consideration. He says his father continued to live on the farm until his death in 1940; that it was his father's wish and intention that Ray should have the south half of the farm and at the family meeting following his father's death, the widow and all the heirs, including Ray, simply attempted to carry out their father's wishes.

Mrs. Matlock testified that she and Ray were married in 1934 when Ray was about 22 years of age. Consequently, Ray was apparently about eight years of age when the property was first acquired and legal title vested in Troy in 1920. He was apparently about 21 years of age when Troy made the deed to him at their father's request in 1933. Under close questioning by the chancellor as to the reason for the *two* deeds to Ray, Troy testified that in 1933 his own wife of three months sued him for divorce which was subsequently granted. He says that when his father had him deed the land to Ray in 1933, and had the deed backdated to 1928 to avoid the possibility of it becoming involved in the divorce litigation; such procedure was not necessary because his wife knew that the land did not belong to him. He says that after the conveyance to Ray at his father's request, and after his divorce had become final, Ray questioned the validity of the deed because it was backdated and at Ray's request he executed the second deed dated correctly on the day it was executed. Troy testified without contradiction that he never did pay to his father, or receive from his father or from Ray, anything in consideration for the deed he received in 1920 or executed in 1933. There is no evidence, circumstantial or otherwise, that Ray ever paid anything to anyone in consideration for the deeds from Troy. We conclude, therefore, that the chancellor did not err in finding that a resulting trust was created in favor of Tom McCracken.

We find no merit in the appellant's last assignment that the chancellor erred in not applying the doctrine

of laches. There is no evidence that anyone ever questioned Troy's ownership of the property he claims until this suit was commenced by Mrs. Matlock in questioning Troy's right to possession. On the contrary, there was an abundance of evidence that Ray had at all times recognized that he only held the title in trust. It is only delay which works a disadvantage to another that operates as an estoppel against the assertion of a right. *Norfleet* v. *Hampson,* 137 Ark. 600, 209 S. W. 651; *Baker* v. *Applen,* 181 Ark. 454, 26 S. W. 2d 109. We are of the opinion that no such delay was shown in this case. According to the evidence, as we read the record, Troy was in peaceable possession of the property he claimed and no one questioned his right to possession until this action was commenced by Mrs. Matlock questioning his right to the possession. She admits he had been exercising his right of possession since 1962 or 1963 and had been in complete possession since 1966. Troy and several other witnesses say he had been in possession since soon after his father's death in 1940.

The decree is affirmed.